2019 PA Super 352

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| DEAUNTAY DONTAZ MOYE | : | |
| | : | |
| Appellant | : | No. 120 WDA 2019 |

Appeal from the Judgment of Sentence entered on December 20, 2018
in the Court of Common Pleas of Bedford County,
Criminal Division at No(s):  CP-05-CR-0000486-2015.

BEFORE:  BENDER, P.J.E., KUNSELMAN, J., and MUSMANNO, J.

OPINION BY KUNSELMAN, J.:                    **FILED NOVEMBER 27, 2019**

Deauntay Dontaz Moye appeals from the judgment of sentence of life imprisonment without the possibility of parole imposed following his resentencing for a homicide he committed as a juvenile.  We vacate his judgment of sentence and remand for resentencing.

In January of 2015, two weeks before he turned seventeen, Moye and another juvenile, Ryan Hardwick, arranged to purchase marijuana from a dealer at a designated location.  Although Moye and Hardwick expected to meet the dealer, the dealer sent his girlfriend, Stephanie Walters, to carry out the transaction.  Walters arrived at the designated location in her vehicle, picked up Moye and Hardwick, and drove to a parking lot.  After Moye and Hardwick inspected the drugs, Moye, who was carrying a .22 revolver, shot Walters twice in the head.  Using the same gun, Hardwick then shot and killed

Walter's dog, which was also in the car. Moye and Hardwick then moved Walters's body to the back seat of her vehicle, and proceeded to drive the vehicle around the Altoona area for some time while they got high on the marijuana. Walters was still alive for approximately twenty minutes. Ultimately, they dropped the vehicle off near an abandoned house, and Hardwick hid the car keys and the gun at his house. Hardwick told police that he and Moye had been planning to rob someone for marijuana for several weeks, and that Moye had been talking about wanting to shoot someone.

On September 20, 2016, Moye entered a guilty plea to criminal homicide-murder of the first degree, robbery, conspiracy, abuse of a corpse, animal abuse, unauthorized use of a motor vehicle and firearms charges. On the homicide count, the court sentenced Moye to life in prison without the possibility of parole. On the remaining counts, the court sentenced Moye to various prison terms ranging from a minimum of one month to a maximum of 20 years, all to run concurrently to the other counts. Moye timely appealed his sentence.

While his direct appeal was pending, the Pennsylvania Supreme Court decided **Commonwealth v. Batts**, 163 A.3d 410 (Pa. 2017) (hereinafter "**Batts II**"), which relied on the United States Supreme Court decision in **Miller v. Alabama**, 132 S. Ct. 2455, 2464 (2012). In **Miller**, the High Court recognized that juveniles have diminished culpability and greater prospects for reform, and that due to their lack of maturity, juveniles are less deserving

of the most severe punishments. The **Batts II** Court created a presumption against the imposition of a sentence of life without the possibility of parole for a defendant convicted of first-degree murder committed as a juvenile, and further held that the Commonwealth bears the burden of rebutting this presumption by establishing beyond a reasonable doubt that the juvenile offender is "permanently incorrigible" and "unable to be rehabilitated." **Batts II**, 163 A.3d at 459.

Following **Batts II**, this Court remanded Moye's direct appeal to the trial court for resentencing. The trial court conducted a resentencing hearing on September 6, 2018. In advocating that the court resentence Moye to life imprisonment without parole, the only new evidence that the Commonwealth presented at the resentencing hearing was a victim impact statement. Moye presented the testimony and supplemental expert report of Bruce Wright, M.D.,[1] a forensic psychiatrist, who opined that it was possible that Moye could be rehabilitated. Dr. Wright could not conclude that Moye was permanently incorrigible or incapable of rehabilitation.

Nevertheless, on December 20, 2018, the trial court found Moye permanently incorrigible beyond a reasonable doubt, and thereafter re-imposed a sentence of life imprisonment without the possibility of parole on the homicide conviction. Moye filed a timely post-sentence motion, which the

---

[1] Dr. Wright prepared an expert report and provided expert testimony in connection with Moye's initial sentencing in 2016.

trial court denied. Moye thereafter filed the instant timely appeal. Both Moye

and the trial court complied with Pa.R.A.P. 1925.

Moye raises six issues for our review, all related to his resentencing:

I. Whether the trial [court] erred when it found that the Commonwealth sustained its burden to prove beyond a reasonable doubt that [Moye] is permanently [incorrigible] and thus is unable to be rehabilitated?

II. Whether the trial court erred by failing to provide [Moye] with any hope of parole or any hope of parole at a reasonable age and consideration for his [amenability] to rehabilitation fails to sufficiently take [Moye's] age at the time of the offense into consideration as discussed in *Miller v. Alabama* and [*Batts II*]?

III. Whether the trial court's application of a sentence of life imprisonment without the possibility of parole as [Moye] was a juvenile at the time of the offenses violates the protections provided against cruel punishment pursuant to the [E]ighth [A]mendment of the United States Constitution and Article 1-7 Section 13 of the Pennsylvania Constitution?

IV. Whether the trial court erred when it imposed a sentence upon [Moye] that exhibited bias, ill will and prejudice that [was] also manifestly excessive and excessively punitive in nature?

V. Whether the trial court abused its discretion in applying the required factors outlined in 18 Pa.C.S.A. § 1102.1(d) to find that factors weighed heavily against [Moye] thereby justifying the imposition of life without parole?

VI. Whether the trial court abused its discretion in imposing a sentence of life imprisonment without parole when it failed to consider mitigating evidence and factors presented to [it]?

Moye's Brief at 7-8 (issues renumbered for ease of disposition).

Before we address Moye's specific claims, we begin with a review of the

controlling decisional law regarding juvenile sentencing. In recent years, the

United States Supreme Court has recognized that juveniles are less mature,

- 4 -

more vulnerable or susceptible to negative influences, and that only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood. *See Roper v. Simmons*, 543 U.S. 551 (2005); *see also Graham v. Florida*, 556 U.S. 1220 (2010). In *Miller*, the High Court reiterated, "that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller*, 567 U.S. at 471-72. The High Court observed that "none of what it said about children — about their distinctive (and transitory) mental traits and environmental vulnerabilities — is crime-specific." *Id.* at 473. Rather, the *Miller* Court reasoned that "[d]eciding that a 'juvenile offender forever will be a danger to society' would require 'mak[ing] a judgment that [he] is incorrigible' — but 'incorrigibility is inconsistent with youth.'" *Id.* at 472-73 (quoting *Graham*, 560 U.S. at 72).

Based on these considerations, the *Miller* Court held that a sentencing scheme that mandates the imposition of a life-without-parole sentence for a juvenile violates the Eighth Amendment to the United States Constitution. While it did not foreclose the possibility that a child could be sentenced to life imprisonment without parole in a homicide case, it concluded that sentencing for juveniles must be individualized, and that this requires consideration of the defendant's age at the time of the offense, as well as the hallmark features of youth, including:

immaturity, impetuosity, and failure to appreciate risks and consequences[;] . . . the family and home environment that surrounds him — and from which he cannot usually extricate himself — no matter how brutal or dysfunctional[;] . . . the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him[;] . . . that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth — for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys[;] . . . [and] the possibility of rehabilitation . . . when the circumstances [(the youthfulness of the offender)] most suggest it.

*Id*. at 474-78; *see also id*. at 476 (stating that, in addition to age, a court must also give consideration to a juvenile offender's background and mental and emotional development in assessing his culpability).

In *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), the United States Supreme Court held that "*Miller* announced a substantive rule that is retroactive in cases on collateral review." *Montgomery*, 136 S. Ct. at 732. The *Montgomery* Court clarified that *Miller* requires far more than mere consideration of an offender's age prior to imposing a life-without-parole sentence, as such a sentence "still violates the Eighth Amendment for a child whose crime reflects "unfortunate yet transient immaturity.'" *Id.* (quoting *Miller*, 567 U.S. at 479). As explained by the *Montgomery* Court, life without parole is a disproportionate sentence for all but the rarest of children, those whose crimes reflect irreparable corruption, permanent incorrigibility, and such irretrievable depravity that rehabilitation is impossible, thereby excluding

the vast majority of juvenile offenders from facing a sentence of life in prison without the possibility of parole. *Id.* at 726, 733, 734.

In **Batts II**, the Supreme Court of Pennsylvania reviewed the controlling United States Supreme Court decisions, and determined that in order to impose upon a juvenile offender a life sentence without the possibility of parole, the sentencing court must first determine that his or her rehabilitation at any point in the future is impossible:

> [F]or a sentence of life without parole to be proportional as applied to a juvenile murderer, the sentencing court must first find, based on competent evidence, that the offender is entirely unable to change. **It must find that there is no possibility that the offender could be rehabilitated at any point later in his life, no matter how much time he spends in prison and regardless of the amount of therapeutic interventions he receives**, and that the crime committed reflects the juvenile's true and unchangeable personality and character. **Montgomery**, 136 S. Ct. at 733 (stating that pursuant to **Miller**, life without parole is only justified for "the rare juvenile offender who exhibits such irretrievable depravity that **rehabilitation is impossible**").

**Batts II**, 163 A.3d at 435 (emphasis added). The **Batts II** Court also established the standard of review of a trial court's order imposing a sentence of life in prison without the possibility of parole upon a defendant who committed murder of the first degree as a juvenile:

> Under **Miller** and **Montgomery**, a sentencing court has no discretion to sentence a juvenile offender to life without parole unless it finds that the defendant is one of the "rare" and "uncommon" children possessing the above-stated characteristics, permitting its imposition. **Montgomery**, 136 S. Ct. at 726, 734; **Miller**, 567 U.S. at 479, 132 S. Ct. 2455. A sentence of life in prison without the possibility of parole for a murder committed when the defendant was a juvenile is otherwise

disproportionate and unconstitutional under the Eighth Amendment. ***Montgomery***, 136 S. Ct. at 734, 735.

Thus, in the absence of the sentencing court reaching a conclusion, supported by competent evidence, that the defendant will forever be incorrigible, without any hope for rehabilitation, a life-without-parole sentence imposed on a juvenile is illegal, as it is beyond the court's power to impose. As stated by the ***Montgomery*** Court, "when a State enforces a proscription or penalty barred by the Constitution, the resulting conviction or sentence is, by definition, unlawful." ***Montgomery***, 136 S. Ct. at 729-30. As such, we must review the sentencing court's legal conclusion that [a defendant] is eligible to receive a sentence of life without parole pursuant to a *de novo* standard and plenary scope of review. Because this legal conclusion is premised upon the presentation of testimony and the sentencing court's credibility determinations, it presents a mixed question of fact and law. In such circumstances, we defer to the findings of fact made by the sentencing court as long as they are supported by competent evidence, but give no deference to that court's legal conclusions.

***Batts II***, 163 A.3d at 435-36 (some citations omitted).

The ***Batts II*** Court went on to rule that "in Pennsylvania, a faithful application of the holding in ***Miller***, as clarified in ***Montgomery***, requires the creation of a presumption against sentencing a juvenile offender to life in prison without the possibility of parole." ***Id***. at 452. It further ruled that, "to overcome the presumption against the imposition of a sentence of life without parole for a juvenile offender, the Commonwealth must prove that the juvenile is constitutionally eligible for the sentence beyond a reasonable doubt. In an effort to satisfy this burden, the Commonwealth may present evidence relating

to the factors announced in **Miller** and the factors appearing in [the sentencing code at 18 Pa.C.S.A. §] 1102.1(d)."[2] **Batts II**, 163 A.3d at 455.

---

[2] Pennsylvania's General Assembly responded to **Miller** by enacting a new sentencing statute for juveniles convicted of first-degree murder after June 24, 2012. **See** 18 Pa.C.S.A. § 1102.1(a). When determining whether to impose a sentence of life imprisonment without the possibility of parole on a juvenile convicted of murder, § 1102.1 requires a court to consider and make findings on the record regarding the following individual factors:

> (1) The impact of the offense on each victim, including oral and written victim impact statements made or submitted by family members of the victim detailing the physical, psychological and economic effect of the crime on the victim and the victim's family.
>
> (2) The impact of the offense on the community.
>
> (3) The threat to the safety of the public or any individual posed by the defendant.
>
> (4) The nature and circumstances of the offense committed by the defendant.
>
> (5) The degree of the defendant's culpability.
>
> (6) Guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing.
>
> (7) Age-related characteristics of the defendant, including:
> 　　(i) Age.
> 　　(ii) Mental capacity.
> 　　(iii) Maturity.
> 　　(iv) The degree of criminal sophistication exhibited by the defendant.
> 　　(v) The nature and extent of any prior delinquent or criminal history, including the success or failure of any previous attempts by the court to rehabilitate the defendant.
> 　　(vi) Probation or institutional reports.
> 　　(vii) Other relevant factors.

In his first issue, Moye challenges the trial court's finding that he is permanently incorrigible beyond a reasonable doubt. He relies on the expert testimony of Dr. Wright, who examined Moye for purposes of his initial sentencing, and reexamined Moye for his resentencing. At Moye's resentencing hearing, Dr. Wright opined that, since his initial sentencing, Moye had participated in therapeutic programming (including a leadership development program) and the therapeutic community, had begun to study and practice the Muslim religion, and that Moye's comments demonstrated that he had gained insights and improvements since their prior contact. Significantly, Dr. Wright testified that he could **not** provide an opinion that Moye was irreparably corrupt, irretrievably depraved, permanently incurable, or state with certainty that there is **no** chance of Moye's rehabilitation. Because Dr. Wright saw improvements in Moye, and was unable to state that

_____

18 Pa.C.S.A. § 1102.1(d). As noted by the **Batts II** Court, "some of the **Miller** factors are noticeably absent from section 1102.1(d)." **Batts II**, 163 A.3d at 455 n.23. Indeed, in our view, § 1102.1(d) seems to focus more of the crime itself, whereas **Miller** and **Montgomery** direct us to consider the "possibility of rehabilitation," which is not a consideration under § 1102.1(d). However, we reiterate that, in addition to the § 1102.1(d) factors, **all** of the **Miller** factors must be considered by a court prior to sentencing a juvenile to life imprisonment without parole. **Id**. (holding that sentencing courts should consider the **Miller** factors and the § 1102.1(d) factors prior to imposing a life without parole sentence on a juvenile offender regardless of whether the juvenile was convicted pre- or post-**Miller**).

Moye is not amenable to treatment, Moye claims that the Commonwealth did not prove he is permanently incorrigible.

Moye further contends that the trial court was presented with several factors mitigating against a life without parole sentence, including his age of 16 at the time of his offense, his lack of any significant criminal history, his prior record score of zero,[3] his long history of substance abuse, his chaotic and unstable home life, his lack of a solid support system or role models, his relocation to Bedford County, his involvement in dependency and delinquency proceedings, and his placements outside the home. He claims that his contact with the criminal justice system is not due to some innate incorrigibility, but rather his unstable home life and introduction to drug use and drug dealing at a young age.

Here, the record reflects that the sentencing court considered both the factors announced in *Miller* and the factors appearing in § 1102.1(d). In addressing those factors, the sentencing court noted the following circumstances and events marking Moye's life from childhood up through his incarceration for his homicide conviction.

Moye had a difficult and chaotic childhood. *See* N.T. Resentencing, 12/20/18, at 24-25. His parents never married; he had limited contact with

---

[3] Although his prior record score was zero, Moye acknowledges that he had two non-violent misdemeanor adjudications as a juvenile for receiving stolen property and theft by unlawful taking.

- 11 -

his father, and no stable father-figure. *Id*. at 14, 25. As a child, Moye moved frequently due to his mother's relationships with various boyfriends. *Id*. at 13. According to Moye, if there was a disagreement, his mother always picked the boyfriend over him. *Id*. at 13-14. During elementary school, Moye was involved in frequent fights, and was often suspended or given detention. *Id*. at 13. In fifth grade, Moye began working as a "corner boy" exchanging drugs (heroin) for money in Baltimore. *Id*. at 14. Moye told Dr. Wright that he engaged in arson by burning down a couple of houses (one abandoned and two occupied) because he and his friends were bored. *Id*. Moye also indicated that he engaged in "gunplay" by shooting guns all through the city, and participated in gang activity due to his poor relationship with his mother. *Id*. at 14-15.

In 2010, when Moye was twelve, his mother moved him to Bedford County, Pennsylvania, due to his criminal activities in Baltimore. *Id*. at 15. Moye's behavioral issues continued after the move, and he was kicked out of school in the sixth grade after he exposed himself. *Id*. at 15-16. Moye then attended an alternative education program for one and one-half years, before returning to school in the eighth grade. *Id*. at 16. Moye got into a fight and failed to do any work, and was again kicked out of school and sent back to alternative education program. *Id*.

In 2011, when Moye was thirteen, he was placed in the Children's Aid Home because he got in a physical altercation with his mother at school. *Id*.

Moye escaped from the home after thirty days, and remained at large until police found him.[4] *Id*. In 2013, when Moye was fifteen, he was re-admitted to the Children's Aid Home because he had pending delinquency and dependency matters. *Id*. at 17. Moye admitted to breaking into and stealing cars. *Id*. He also told to Dr. Wright that, while living in Bedford County, he threatened people with weapons while attempting to steal from them, intimidated people, and continued to sell drugs. *Id*. at 17-18. Dr. Wright also found that Moye had a severe substance abuse problem, as he had consumed marijuana, alcohol and opiods on a daily basis since pre-adolescence. *Id*. at 20.

In 2014, Moye was placed at Outside In boot camp as part of the delinquency action after he was caught stealing a car. *Id*. at 17. Moye did very well in that program and was released after five months and placed on probation. *Id*. However, less than two months after his release from Outside In, Moye committed the offenses at issue. *Id*. at 55.

In 2016, prior to his initial sentencing for the crimes in this matter, Dr. Wright evaluated Moye and diagnosed him with conduct disorder-childhood onset severe, cannibus use disorder, alcohol use disorder, and opioid use disorder. *Id*. at 20. He also noted that Moye had a history of severe and, at

---

[4] The record does not reflect how long Moye was at large before police apprehended him.

times, very dangerous impulsivity, and very severe and dangerous recidivist behavior. *Id*. at 21.

In 2018, prior to his resentencing for the crimes in this matter, Dr. Wright re-evaluated Moye and prepared a supplemental expert report. Dr. Wright noted that Moye was briefly incarcerated at SCI Camp Hill, and had no disciplinary or behavior problems at that facility.[5] *Id*. at 22. However, since his transfer to SCI Pine Grove in February 2017, he had experienced ups and downs. *Id*. At SCI Pine Grove, Moye was involved in a physical altercation with another inmate, and was re-assigned to the Restrictive Housing Unit for three days. *Id*. at 23. He had another disciplinary problem when a verbal altercation with an inmate became physical, and Moye "messed up" the other inmate's face. *Id*. at 23-24. Moye was reassigned to the Restrictive Housing Unit for an additional period of time. *Id*. at 24.

Notably, the sentencing court acknowledged that Dr. Wright identified several positive prognostic indicators. *Id*. at 26. Specifically, Dr. Wright indicated that Moye expressed a desire to improve, and was participating in classes, leadership development programs, therapeutic communities, and religious activities. *Id*. at 22-23, 26. Moye indicated that he understood that he had done something wrong when he was a kid, but noted that he was now 20, and that he had grown so much, and wanted the world to see that he was

_____

[5] The record does not reflect how long Moye was at SCI Camp Hill.

- 14 -

a changed individual and can be in society again. *Id*. at 24. Moye further indicated that he had things he wanted to accomplish; namely, finish school, take rehabilitation programs, and do some things on his own. *Id*. Dr. Wright observed that Moye is relatively young and will mature with time and continued treatment and rehabilitation. *Id*. at 26.

The sentencing court also considered the presentence investigation report ("PSI"), which indicated Moye's juvenile misdemeanor offenses of theft by unlawful taking and receiving stolen property in 2013, and another theft by unlawful taking in 2014, which was graded as a third-degree felony. *Id*. at 31. While Moye was on supervision and probation for these offenses, he violated the terms of such supervision and probation by testing positive for marijuana, failing to report to the probation office and outpatient drug and alcohol counseling for scheduled appointments, and failing to meet his academic expectations and requirements. *Id*. at 33-34. The PSI also detailed Moye's delinquency and dependency actions, and placements with various agencies. *Id*. at 36.

The PSI further indicated that on December 29, 2014, a violation of probation was filed against Moye for testing positive for marijuana on December 19, 2014, and for failing to report to the probation office. A violation of probation hearing was scheduled for January 9, 2015. *Id*. at 34. On the afternoon preceding the hearing, Moye and his mother met with Moye's probation officer, who advised them of the different outcomes that the court

could impose the following day. *Id*. at 34-35. Moye left the probation office at approximately 4:50 p.m. on January 8, 2015, and appeared in court the next morning at 9:00 a.m. *Id*. at 35. In the intervening hours, he murdered Walters. *Id*.

After discussing Moye's background in relation to the *Miller* factors and the § 1102.1(d) factors, the sentencing court found "beyond a reasonable doubt that [Moye] is permanently incorrigible, irretrievably depraved, and incapable of being rehabilitated. N.T. Resentencing, 12/20/ 18, at 89. It thereafter resentenced Moye to life in prison without the possibility of parole. *Id*. at 90.

Based on our review of the record, and mindful of the Commonwealth's burden of proof, we conclude that the sentencing court's legal conclusion that Moye is entirely incapable of being rehabilitated is not supported by the record. Moye enjoyed a presumption against the imposition of a life without parole sentence, and the Commonwealth bore the burden of proving beyond a reasonable doubt that there is no possibility that Moye could be rehabilitated at any point later in his life, no matter how much time he spends in prison and regardless of the amount of therapeutic interventions he receives. *See Batts II*, 163 A.3d at 435. Indeed, the *Batts II* Court recognized that a presumption operates as proof of the ultimate fact *unless and until the opposing party comes forward with evidence sufficient to rebut the presumption*. *Id*. at 453. Critically, the Commonwealth did not retain an

expert, submit an expert report, or present expert testimony on this critical issue.

While the ***Batts II*** Court did not specifically require expert testimony for a court to determine that a juvenile offender is permanently incorrigible, it certainly highlighted the value of input from expert psychologists. Indeed, ***Batts II*** acknowledged the difficulty "even for expert psychologists to distinguish[] at this early age between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." ***Id***. at 432 (quoting ***Miller***, 567 U.S. at 479-80) (internal citations and quotation marks omitted). ***Batts II*** further observed that:

> Given the presumption against life without parole and the Commonwealth's burden beyond a reasonable doubt to rebut the presumption, ***it is difficult to conceive of a case where the Commonwealth would not proffer expert testimony and where the sentencer would not find expert testimony to be necessary***.

***Batts II***, 163 A.3d at 456 (emphasis added); ***see also id***. at 460-61 (Wecht, J., concurring) ("Following today's decision, the Commonwealth likely will (and I believe should) retain and present an expert in the vast majority of [life without parole] resentencing hearings, if not in all of them.")

We note that the only evidence that the Commonwealth presented at the resentencing hearing was the impact statement of Walter's mother. The Commonwealth presented no evidence whatsoever regarding Moye's inability to be rehabilitated at the resentencing hearing. Thus, the Commonwealth

failed to rebut the presumption against life without parole as an appropriate individualized sentence for Moye.

Although the Commonwealth did not come forward with evidence to rebut the presumption against a life without parole sentence, Moye nevertheless offered credible testimony at the resentencing hearing regarding his prospects for rehabilitation through the testimony and supplemental expert report of Dr. Wright.  As noted above, Dr. Wright specifically opined, to a reasonable degree of medical certainty, that, in time and "with maturation, structure and appropriate interventions," it is possible that Moye could be successfully rehabilitated.  *See* Wright Supplemental Expert Report, 9/4/18 at 6; *see also* N.T. Resentencing Hearing, 9/6/18, at 46 ("It's . . . impossible for me to sit here to . . . say that's there no chance of rehabilitation several decades down the road. . . . I would say it's possible.")

Importantly, the sentencing court found Dr. Wright's findings and opinions to be "credible," "informative" and indicated that they provide "good guidance."  *See* N.T. Resentencing, 12/20/18, at 77.  As the record supports the sentencing court's determination that Dr. Wright offered credible expert testimony, we accept this finding for purposes of our review.  *Batts II*, 163 A.3d at 435-36 (holding that we defer to the credibility determinations and findings of fact made by the sentencing court, as long as they are supported by competent evidence).  However, we give no deference to the court's legal conclusions.  *Id*.

Here, in making its legal determination that Moye is permanently incorrigible and incapable of rehabilitation, the sentencing court largely ignored the positive prognostic indicators identified by Dr. Wright, and repeatedly stated that the only factors suggesting that Moye could be rehabilitated were his negative childhood environment, age and his positive performance while in juvenile placement at Outside In. *See id*. at 79, 80. This limited assessment fails to account for Moye's efforts to improve himself while in prison, and the credible expert opinion of Dr. Wright that, in time and "with maturation, structure and appropriate interventions," it is possible that Moye could be successfully rehabilitated. *See* Wright Supplemental Expert Report, 9/4/18 at 6. Instead, the sentencing court overly focused on the nature of the crimes Moye committed, repeatedly noting that the homicide was cold-hearted, callous and premeditated. *See* N.T. Resentencing, 12/20/18, at 57-62, 65-66, 74-75, 81-82, 84-85, 86-87. However, we must be mindful of "*Miller*'s central intuition," which is "that children who commit even heinous crimes are capable of change." *Montgomery*, 136 S. Ct. at 736

As explained by the *Batts II* Court, pursuant to established United States Supreme Court precedent, the ultimate issue here is not the nature of the crime committed, but whether an offender is capable of rehabilitation. *Batts II*, 163 A.3d at 452. Our review of the record finds positive support relative to Moye's potential for rehabilitation. Hence, the sentence of life imprisonment without parole was beyond the sentencing court's power to

impose, and therefore illegal. Accordingly, we conclude that the sentence of life in prison without the possibility of parole for Moye is disproportionate under **Miller** and **Montgomery**, and thus violates the Eighth Amendment to the United States Constitution.[6] As such, we vacate Moye's judgment of sentence and remand for resentencing.[7]

This will be the third time that Moye, who is now 21 years old, will face sentencing for his crimes. Upon resentencing, the court "must provide [Moye] some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."[8] **Miller**, 567 U.S. at 479 (quoting **Graham**, 560 U.S. at 74).[9]

---

[6] As explained by the **Batts II** Court, given the interest at issue (here, a juvenile's loss of his or her fundamental right to liberty), "an erroneous decision in favor of the offender (*i.e.*, sentencing the offender to a term of life **with** the possibility of parole), carries minimal risk; if the juvenile offender is one of the very rare individuals who is incapable of rehabilitation, he or she simply serves the rest of the life sentence without ever obtaining release on parole." **Batts II**, 163 A.3d 454.

[7] Based on our disposition of Moye's first issue, we need not address his remaining issues.

[8] Our decision here should not be interpreted as minimizing the seriousness of the reprehensible crimes Moye committed. His senseless and needless acts of violence took the life of a young woman, and her family is living with the consequences. There is no question that Moye, as a sixteen-year-old murderer, must be held accountable and serve a sentence commensurate with his actions. Our decision merely reflects the distinction that the law now recognizes between juveniles and adults who commit the crime of murder.

[9] This directive applies to the sentencing court's overall sentencing scheme, and not merely to the sentence imposed on Moye's homicide conviction.

Judgment of sentence vacated, case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/27/2019